IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TYRONE HENRY,                          )
                                       )
                 Plaintiff,            )
                                       )        No.  CV-06-712-HU
        v.                             )
                                       )
PORTLAND DEVELOPMENT                   )
COMMISSION, LORI SUNDSTROM,            )
and BRUCE WARNER,                      )        FINDINGS & RECOMMENDATION
                                       )
                 Defendants.           )
_____)

Tom Steenson
Zan Tewksbury
STEENSON, SCHUMANN, TEWKSBURY, CREIGHTON & ROSE, P.C.
500 Yamhill Plaza Building
815 S.W. Second Avenue
Portland, Oregon 97204

        Attorneys for Plaintiff

Clarence M. Belnavis
Rachelle Hong Barton
FISHER & PHILLIPS LLP
111 S.W. Fifth Avenue, Suite 1250
Portland, Oregon 97204

        Attorneys for Defendants

HUBEL, Magistrate Judge:

        Plaintiff Tyrone Henry brings this employment and civil rights

action against his former employer, the Portland Development

1 - FINDINGS & RECOMMENDATION

Commission (PDC), and two of its executives, Lori Sundstrom and Bruce Warner. Defendants move for summary judgment. I recommend that the motion be granted as to some of the punitive damages claims, and otherwise denied. Plaintiff moves to strike certain evidence and argument by defendant. I deny that motion.

BACKGROUND

The PDC is the urban renewal agency of the City of Portland. The agency is governed by a five-member board of commissioners who are appointed by the Mayor and approved by the City Council. The Commission's day-to-day functions are carried out through its Executive Director, who oversees approximately 180 employees.

Plaintiff, who is African-American, was hired by the PDC in 1998. The record is a bit unclear regarding his initial position, but it appears that after about one year, he took on responsibility for the PDC's Minority, Women, and Emerging Small Business Program (MWESB). After a brief period, Linda Andrews became his immediate supervisor.

According to plaintiff, he spearheaded efforts to increase the number of minority contractors, union and non-union trade organizations, developers, workers, and community-based organizations, involved in carrying out the PDC's mission by encouraging the PDC to adopt a more formalized set of programs targeting not just emerging small businesses, but minority and women-owned businesses as well. Pltf's Declr. at ¶ 3 (Pltf's Exh. 1). He states that he increased the MWESB "utilization goal" from 10% to 20%. Id. He states that because of his expertise, he was appointed as chair for PDC's Contracting Advisory Committee to assess how best to broaden subcontracting opportunities. Id.

2 - FINDINGS & RECOMMENDATION

Andrews joined the PDC in 1999 as the Professional Services Manager and has held that position throughout her employment with the PDC. According to Andrews, while she generally had a positive working relationship with plaintiff, she felt that he did not take direction well and resented anyone supervising him. Andrews Declr. at ¶ 4. She states that plaintiff's job was relatively new to the PDC when he started, and she initially gave him a lot of latitude in carrying out his job responsibilities. Id. at ¶ 5. Over time, she felt that both she and plaintiff had a better sense of what was required in overseeing the MWESB program. Id. Nonetheless, she was concerned that the success being reported in the MWESB may not directly relate to plaintiff's efforts. Id. She felt plaintiff was delinquent in generating required reports and was generally hostile toward anyone he perceived as being critical of him. Id. at ¶ 8.

Plaintiff's evidence includes the following performance evaluations: (1) an annual evaluation dated October 31, 2001; (2) an evaluation ending June 30, 2003; (3) an evaluation dated July 15, 2004; and (4) an annual evaluation for the period ending July 1, 2005. Pltf's Exhs. 4a-4d. Overall, they are positive, and sometimes quite positive. The October 31, 2001 evaluation contains ratings in sixteen categories and plaintiff was marked as above average or exemplary in all of them. Pltf's Exh. 4a. Overall, he was rated as having an exceptional performance for that period. Id.

The "Overall Performance Rating" for the evaluation dated June 30, 2003, was "exceeds expectations" and plaintiff received a raise. Pltf's Exh. 4b. However, the "Overall Performance Rating"

3 - FINDINGS & RECOMMENDATION

for the evaluation dated July 15, 2004, slipped to "fully successful." Pltf's Exh. 4c. On that evaluation, plaintiff was marked between "rarely" and "often" for displaying certain dependability and communication traits defined by the PDC as indicative of the employee's competence. Id. Finally, on the July 1, 2005 evaluation, plaintiff received a "partially meets" overall ranking for various "results" categories, and a "fully successful" overall ranking for various "competency" categories. Pltf's Exh. 4d. Some individual marks were higher or lower. Id. His overall rating for all categories was "fully successful." Id.

Plaintiff also received a variety of letters of positive recognition while employed by the PDC, as well as several salary raises. Pltf's Exhs. 5, 6.

The July 1, 2005 performance evaluation gives some indication that the period under review, July 1, 2004 to June 30, 2005, was not an easy one. Pltf's Exh. 4d at p. 4. Plaintiff stated that it had been his most challenging year. Id. He made negative comments about how the MWESB annual report was handled and noted poor handling by upper management of "impropriety accusations." Id.

In his declaration, plaintiff states that in late 2004 and early 2005, Andrews and Nancy McClain, the PDC's Chief Financial Officer and Andrews's boss, began treating him differently. Pltf's Declr. at ¶ 7. He makes the same complaint about his subordinates. Id.

He cites to an email he wrote to Andrews on January 25, 2005, in which he complained about how Andrews had approached him regarding a presentation to the PDC Commission. Pltf's Exh. 9. There, plaintiff complained to Andrews that while he did not have

4 - FINDINGS & RECOMMENDATION

a problem giving Andrews and "Nancy" (presumably McClain), an outline of his presentation, he thought her "way of handling" the request (presumably requiring him to give her the presentation), was inappropriate. Id. He accused Andrews of causing him undue stress, mental anguish, and borderline harassment. Id. Plaintiff copied the email to Mary Manning, the PDC's Human Resources Manager.

Next, plaintiff cites to a memorandum dated February 22, 2005, in which he notes an alleged plot by McClain and Andrews to secretly meet with his support staff. Pltf's Exh. 10 ("I have long suspected that Nancy McClain and Linda Andrews have been secretly meeting with my support staff (John Classen & Toni Severe-Marcelin) without any notification or explanation forwarded to me, their Manager."). There is no indication that this memorandum was sent to anyone, but plaintiff states in his declaration that he discussed these concerns with Manning. Pltf's Declr. at ¶ 8.

On March 4, 2005, plaintiff was placed on administrative leave pending an investigation into an allegation that he failed to account for funds contributed to the PDC by Williams & Dame, the developer of the South Waterfront Project. See Pltf's Exh. 14; Pltf's Declr. at ¶ 9.

On March 10, 2005, plaintiff's then-attorney Nicholas Fish wrote to Chip Lazenby, who was general counsel for the PDC at that time, to state that Fish had been "retained to pursue a formal grievance on behalf of Mr. Henry concerning a pattern of workplace harassment and discrimination at the [PDC]." Pltf's Exh. 11. The letter contained a background section which included this paragraph:

> Over the past several months, Mr. Henry has been unfairly targeted by Linda Andrews, his immediate supervisor, and Nancy McClain, PDC's Chief Financial Officer. Their interaction with him has become increasingly abrupt and disrespectful, while his work has been the subject of unwarranted criticism. He has been criticized, among other things, for his writing skills, his decision to seek input of South Waterfront Development Agreement team members in the preparation of his most recent annual report, and his leadership style. When Mr. Henry sought to schedule a meeting with Mary Manning, Human Resources Manger, to address these issues she repeatedly put him off.

Pltf's Exh. 11 at p. 2.

Plaintiff believes the allegation against him concerning the funds was made by his assistant Toni Severe-Marcelin, possibly with McClain's help. Id. at pp. 2-3. An investigation found the allegation to be unsubstantiated. Id. at pp. 2-3.

In his March 10, 2005 letter, Fish articulated a grievance on plaintiff's behalf, alleging violations of several sections of the PDC's written personnel policies. He demanded, at a minimum: (1) a formal written apology from McClain, the then-Executive Director of the PDC Don Mazziotti, and Lazenby, to be placed in plaintiff's personnel file with copies to Dike Dame and someone with the carpenter's union; (2) a formal investigation into the PDC's handling of the matter to be conducted by a mutually agreed-upon outside independent investigator; and (3) an appointment of a new staff assistant given the "role played" by Severe-Marcelin. Id. at p. 3.

On May 10, 2005, Williams & Dame wrote a letter to Mazziotti, strongly urging the PDC to keep plaintiff involved in the work force diversity issues at South Waterfront. Pltf's Exh. 15. Plaintiff states that before his "4/05 racial

6 - FINDINGS & RECOMMENDATION

harassment/discrimination complaint"[1], he was given copies of such positive recognition, but this letter from Williams & Dame was kept from him.  Pltf's Declr. at ¶ 10.

In late July 2005, Manning met with plaintiff and Andrews to go over a "Communication Agreement" in hopes of improving the working relationships between plaintiff and Andrews and plaintiff's peers.  Exh. 1 to Belnavis May 18, 2007 Declr. at p. 81.  The agreement listed nine separate items that plaintiff and Andrews should agree to, including promises not to raise voices, not to walk out of meetings, to listen to the opinions of others, and to acknowledge that the supervisor/manager gets to make the final decision on work-related issues.  Id.

The next day, Andrews, Manning, and Director of Finance Mark Murray, met with plaintiff to go over a performance improvement plan (PIP).  Id. at p. 89.  The PIP indicates that it was a follow-up to a discussion regarding plaintiff's 2004-2005 year-end evaluation, and as apparently discussed, the need for plaintiff to attend to several areas of concern so that his Fiscal Year (FY) 2005-2006 mid-year evaluation would improve and he could achieve a "Fully Successful" rating.  Id.  Three areas of concern were specifically addressed:  teamwork/partnering, dependability, and managing others.  Id. at pp. 89-90.  Each area had comments in three sections:  expected behavior, examples of plaintiff's observed behavior, and an action plan.  Id.

Some of the examples of observed behavior were:  (1)

---

[1]  The reference to a "4/05 racial harassment discrimination complaint" is unclear.

7 - FINDINGS & RECOMMENDATION

disrespectful treatment of other employees as reported by members
of the contracts compliance section; (2) a lack of "partnership"
with Andrews as exemplified by plaintiff's failure to follow-up on
tasks and making personal, unprofessional remarks in meetings; (3)
Andrews's belief that plaintiff failed to update her on key
events/tasks; and (4) failure of the contracts compliance section
to work as a team and present consistent information.  Id.

Andrews went through each of the specific points.  Plaintiff
disagreed with the PIP.  Pltf's Depo. at p. 150 (Exh. 1 to Belnavis
May 18, 2007 Declr.).  In his deposition, plaintiff stated that he
disagreed with it because "it depicted me as not doing certain
things within the agency."  Id.  In his declaration, he states that
he told Andrews and Manning that the allegations about his
relationships and communications with his staff were not true.
Pltf's Declr. at ¶ 18.  Plaintiff refused to sign the PIP and
Andrews indicated it would still go in plaintiff's file and that
plaintiff would be expected to adhere to her improvement plans.
Pltf's Depo. at p. 152.

Plaintiff contends that on August 8, 2005, Fish wrote another
letter on plaintiff's behalf, to Matt Baines, who had apparently
replaced Lazenby as the PDC's general counsel.  Pltf's Exh. 23.  In
contrast to Fish's March 10, 2005 letter, the August 8, 2005 letter
is not on Fish's office letterhead.  Id.  Assuming nonetheless that
Fish wrote the letter, Fish complained on plaintiff's behalf that
the workplace harassment and discrimination had not been resolved.
Id.  Specifically, the letter refers to the PIP and cites
plaintiff's disagreement with several parts of it.  Id.  The letter
also mentions a possible transfer to a different department within

8 - FINDINGS & RECOMMENDATION

the PDC which would have been acceptable to plaintiff. Id. He further states that although he thought plaintiff's March 2005 grievance had been resolved by settlement, the PIP and a recent evaluation raised concern that the PDC continued to treat plaintiff in an unfair and discriminatory manner. Id.

Warner became the PDC's new executive director on August 1, 2005. Early on, he met with all of his "direct reports" to understand their roles and responsibilities and to determine what "hot" issues needed to be addressed. Warner Depo. at p. 21 (Exh. 2 to Belnavis May 18, 2007 Declr.). Even though he did not directly supervise plaintiff, Warner met with plaintiff in September 2005, at plaintiff's request. Plaintiff indicated he wanted someone other than Andrews to supervise him and he gave his ideas for "growing this MWESB program." Pltf's Depo. at pp. 141-43. According to plaintiff, Warner indicated that changing supervisors was a possibility because he was going to be changing things around. Id. at p. 143.

In his declaration, plaintiff states that during this September 2005 meeting with Warner, he complained about the lack of respect and support he received from Andrews and others for the work he was trying to do to grow the MWESB Program. Pltf's Declr. at ¶ 22. He alleges that Warner did not seem interested, did not look him "eye to eye," and looked at his watch instead. Id. He states that he tried on other occasions to meet with Warner to discuss his concerns about the lack of support he was receiving and his attempts to increase the number of minority contractors involved with the PDC's projects, and some of the specific challenges in getting minority contractors involved with South

9 - FINDINGS & RECOMMENDATION

Waterfront, but that Warner never seemed interested.    Id.

Warner testified that he intended to reorganize management so that the MWESB program would be elevated to the executive office, and the manager overseeing plaintiff would be part of the executive team, which Andrews was not.  Warner Depo. at p. 85.  After that change, Warner would then determine what was needed such as resources and staffing.   Id.

Andrews contends that on or about September 22, 2005, she met with plaintiff to go over several emails that other PDC employees had sent complaining about plaintiff, as well as some other issues. Exh. 1 to Belnavis May 18, 2005 Declr. at p. 74 (October 2, 2005 Last Chance Agreement Memorandum noting discussion of September 22, 2005); Pltf's Depo. at pp. 130-31 (stating he saw some emails but not indicating date).  In his deposition, plaintiff stated he did not recall the September 22, 2005 meeting that Andrews referred to in the October 2, 2005 Last Chance Agreement memorandum.  Pltf's Depo. at p. 153.  In his declaration, he states that his calendar bears no reference to any meeting with Andrews for the week of September 19, 2005.  Pltf's Declr. at ¶ 23.

On October 3, 2005, Andrews met with plaintiff and Manning to provide plaintiff with a Last Chance Agreement.  Plaintiff believes that Baines may have also been present.  The agreement outlined various issues that Andrews believed plaintiff was still struggling with such as working productively on teams, being dependable, following through on tasks, and appropriately managing others. Exh. 1 to Belnavis May 18, 2007 Declr. at pp. 74-77.  The agreement, much like the PIP, included various action plans to correct the problems.  Id.

1    During the meeting, plaintiff asked if he could take the
2    document to his attorney to be reviewed. Pltf's Depo. at p. 125.
3    Plaintiff states that his request was refused. Id. He complains
4    that he was never given the opportunity to rebut the assertions in
5    the Last Chance Agreement and never got to speak with Manning,
6    Warner, or Murray about his concerns regarding Andrews. Id. He
7    asserts that the agreement is false or misleading about his job
8    performance. Pltf's Declr. at ¶ 24.

9        The concluding paragraph of the Last Chance Agreement states
10   that failure to sign it or to make "observable improvements," among
11   other things, will result in disciplinary action, up to and
12   including termination. Exh. 1 to Belnavis May 18, 2007 Declr. at
13   p. 77. Plaintiff signed the agreement, indicating that he had read
14   and agreed to the above terms. Id.

15       On October 28, 2005, Warner announced a reorganization of
16   management. Among other changes, he eliminated the deputy
17   executive director position and created an executive officer
18   position. Exh. 2 to Belnavis May 18, 2007 Declr. at p. 12. At the
19   time, the deputy executive director was Wyman Winston, an African-
20   American. Warner hired Sundstrom, a Caucasian, as the new
21   executive officer. She started her position on November 7, 2005.

22       Not long after coming to the PDC, Warner formed a task force
23   to address the business challenges faced by small businesses in
24   general, as well as those covered by the MWESB program. The group
25   consisted of several employees, including plaintiff and Jennifer
26   Nolfi, Economic Development Manager for Small Businesses. The
27   group met on November 8, 2005. Plaintiff contends that while he
28   was making a point during that meeting, Nolfi raised a contrary

11 - FINDINGS & RECOMMENDATION

1  point, and "cut me off[.]"  Pltf's Depo. at p. 84.  The exchange,

2  to plaintiff's recollection, was that he was talking about the

3  MWESB and about how he and his team had "taken it from  nothing to

4  being  one  of  the  best  in  the  state."  Id. at p. 86.  Nolfi

5  apparently made reference to plaintiff as saying that plaintiff was

6  not the only one involved in the program.  Id.

7      Plaintiff states that when Nolfi cut him off, he asked if he

8  could finish his point and he had to say that three times.  Id. at

9  p. 84.  He denies raising his voice.  Id.  There is a dispute about

10  whether he did so.  Plaintiff believes that it was disrespectful of

11  Nolfi to cut him off.  Id. at p. 87.  Sundstrom attended the

12  November 8, 2005 meeting and observed that plaintiff "talked over

13  people, wouldn't respond to the ... topics on the table,  . . . and

14  would not let others speak."  Sundstrom Depo. at p. 128 (Exh. 1 to

15  July 19, 2007 Barton Declr.).

16      Later that day, November 8, 2005, Andrews met with plaintiff

17  after  learning  that  plaintiff  would  be  reporting  directly  to

18  Sundstrom in the near future instead of to Andrews.  Andrews met

19  with plaintiff to see if he had any questions for her regarding the

20  transition.  Plaintiff states that Andrews asked him if there was

21  anything that he needed to discuss regarding the South Waterfront

22  project.  Pltf's Depo. at p. 89.  Andrews apparently stated that

23  she  would  still  be  involved  in  the  project.  Id. at p. 90.

24  Plaintiff states that in response, he said "well, depending -- if

25  you want to still be involved, I don't know, again, I don't know if

26  you're going to be involved or not."  Id.

27      Plaintiff contends that at this point, Andrews began to raise

28  her voice and plaintiff responded by saying that he was not going

12 - FINDINGS & RECOMMENDATION

to "sit here and allow you to berate me or belittle me." Id. He said "this is simply not right, not professional. And until you calm down, I refuse to meet with you." Id. He also said "until you calm down, I don't think that I should have to sit here and listen to you raise your voice at me. I said, I understand you might be a little upset because I'm no longer under your supervision, but I believe that you have received word that I am going to be moving." Id. at pp. 90-91. He then left the room.

Andrews states that it was plaintiff who raised his voice in an aggressive and abusive manner. Andrews Declr. at ¶ 9. Plaintiff states he does not recall if Andrews perceived his speaking to her during this meeting or his body language during this meeting, as being aggressive or insubordinate. Pltf's Depo. at p. 112.

The record is unclear as to how Baines and Manning learned of these two events involving plaintiff on November 8, 2005. But, they did, and they then drafted a memorandum for Warner's signature, dated November 9, 2005, notifying plaintiff that his conduct was considered to be a continued failure to interact positively with his peers.

The memorandum specifically noted that plaintiff was subject to the Last Chance Agreement and its requirement that he adhere to established communications rules during meetings. Id. at p. 78. The memorandum also specifically noted that plaintiff failed to adhere to three particular provisions of the communications rules: (1) agreeing not to raise voices no matter how upset people get; (2) agreeing not to walk out of a meeting unless someone specifically requests a "break," and then the break is no longer

13 - FINDINGS & RECOMMENDATION

than five minutes with all parties agreeing to return; and (3) the manager may make a final decision that all parties do not necessarily agree with and the disagreeing party has the option to tell the manager that although they understand it, is the manager's decision and they will adhere to it, even though they do not agree with it.  Id.

Warner informed plaintiff that it had been explained to Warner that during the November 8, 2005 meeting with Andrews, plaintiff had raised his voice at Andrews in an aggressive and threatening manner, had argued with her about who the decision-maker was on an issue where she and plaintiff had a disagreement, and walked out of the meeting before its completion.  Id.

Warner also referenced the meeting in which plaintiff and Nolfi clashed and noted that plaintiff appeared to fail to "treat others with utmost dignity" because he responded to a statement made by another meeting participant in an aggressive and rude manner during the meeting.  Id. at p. 79.  Warner stated that the outburst was perceived as not only unprofessional, but inappropriate.  Id.

Warner decided not to discharge plaintiff at the time because he wanted to give plaintiff another chance to succeed.  Plaintiff received a two-day suspension.  Id.

Plaintiff recites that for several months before November 8, 2005, he tried to meet with human resources staff to stop Andrews's "mistreatment" of him, when Andrews would allegedly raise her voice and berate and belittle plaintiff.  Pltf's Declr. at ¶ 28. Plaintiff alleges that Manning repeatedly cancelled the meetings and was never of any assistance to plaintiff and thus, Andrews

14 - FINDINGS & RECOMMENDATION

1   continued to be an abusive supervisor.  Id.

2       On or about November 16, 2005, plaintiff and six other
3   minority employees again met with Warner and presented him with a
4   memorandum outlining several points related to diversity at the
5   PDC.  Exh. 2 to Belnavis May 18, 2007 Declr. at pp. 21-28.  The
6   memorandum noted the value that the PDC's policies placed on
7   diversity and Warner's "sentiment . . . that all employees 'will
8   support diversity goals and work toward a diverse workplace.'"  Id.
9   at p. 21.  The memorandum also included ideas as to how the PDC
10  could do a better job of hiring, retaining, and utilizing diverse
11  individuals, expressed the opinion that the PDC should increase the
12  number of diverse contractors and other entities with which it
13  works, suggested steps that the PDC could take to implement the
14  goal of increasing diversity, and included an article and a related
15  outline on workplace diversity.  Id. at pp. 21-28.

16      The memorandum lacked any specific criticism of Warner or
17  other members of management.  Rather, it spoke more generally to
18  steps to be taken to increase diversity.  Id.  However, during the
19  meeting, the employees raised a number of specific examples of what
20  they perceived as discrimination at the PDC.  Pltf's Exh. 50 (Cain
21  Declr.) at ¶ 11.

22      According to plaintiff, Warner noted that "he was there to
23  listen, and he would take everything back to his management staff
24  and discuss it."  Pltf's Depo. at pp. 48-49.  Plaintiff does not
25  recall anything inappropriate said or done by Warner at that
26  meeting.  Id. at p. 49.

27      In mid-November 2005, Sundstrom officially began supervising
28  plaintiff and took over management responsibility for the MWESB

15 - FINDINGS & RECOMMENDATION

program.  Sundstrom met with plaintiff and Andrews together to go over plaintiff's personnel record and "his issues."  Sundstrom Depo. at p. 122 (Exh. 3 to Belnavis May 18, 2007 Declr.).  During this meeting, Sundstrom, Andrews, and plaintiff reviewed the Communication Agreement, the Last Chance Agreement, and Warner's November 8, 2005 Memorandum.  All three documents preceded Sundstrom's supervising plaintiff.

During this time, Sundstrom met with other employees who reported to her, to introduce herself and get to know them.  One of them was John Classen, Project/Program Specialist.  Plaintiff was Classen's direct supervisor.

During the meeting Sundstrom had with Classen, Classen raised several concerns about plaintiff.  He indicated that he wanted to be reassigned to another job or department because he did not like working for plaintiff.  Id. at p. 90.  Classen had previously complained in July 2005 to Manning about verbal and email harassment by plaintiff, as well as threatening conduct by plaintiff.  Exh. 1 to Belnavis May 18, 2007 Declr. at pp. 82-85. Classen even called in sick one day because of stress he attributed to plaintiff.  Id.  Sundstrom listened to Classen's concerns and let Classen decide if he wanted her to take action.  Sundstrom Depo. at p. 94.  He was applying for other positions and indicated that he was fine with continuing his work until he found something else.  Id.

While he had worked for Andrews, plaintiff and Andrews had several conversations about staffing the MWESB program.  In February 2005, plaintiff's assistant Toni Severe-Marcelin, was reassigned to assist with another department.  Andrews Declr. at ¶

16 - FINDINGS & RECOMMENDATION

1    6.  Andrews asserts that plaintiff asked for additional resources
2    in early 2005, and Andrews took that request to her manager,
3    McClain.  Id.  They decided to ask plaintiff to prepare a report
4    outlining why he needed extra staff.  Id.

5        Andrews states that months went by and she inquired repeatedly
6    as to the status of the report.  Id. at ¶ 7.  Andrews contends that
7    plaintiff stated he no longer needed the help.  Id.  Nonetheless,
8    he submitted the report on or about July 27, 2005.  Id.  The
9    October 2, 2005 Last Chance Agreement notes that recruitment for an
10   additional staffperson was authorized and paperwork submitted to
11   Human Resources on August 30, 2005.  Exh. 1 to Belnavis May 18,
12   2007 Declr. at p. 76.  In that Agreement, Andrews notes that she
13   was open to discussing placing a temporary employee in the Contract
14   Compliance Section during the recruitment.  Id.

15       When Sundstrom took over the supervision of plaintiff and the
16   MWESB Program in mid-November 2005, she met with plaintiff about
17   his request for more staffing.  She indicated that she needed time
18   to assess what plaintiff was doing in order to determine if more
19   staff was needed.  Sundstrom Declr. at ¶ 3.  Sundstrom spoke to
20   Warner about trying to secure additional resources from the City of
21   Portland and others to help manage and monitor the program.  Warner
22   Depo. at p. 85.

23       In his declaration, plaintiff states that starting in mid-
24   2005, he repeatedly complained to no avail about the lack of
25   staffing for the MWESB Program.  Pltf's Declr. at ¶ 20.  As
26   evidence, he first points to the July 27, 2005 memorandum regarding
27   staffing.  This is the memorandum that Andrews states plaintiff
28   finally produced after Andrews requested it in February 2005.

17 - FINDINGS & RECOMMENDATION

1    Next, plaintiff points to an August 27, 2005 email he sent to
2  Mark Murray, Cheryl Twete, Baines, and Warner, which complained
3  about including Andrews on some of the issues involved in the South
4  Waterfront Apprentice Agreement and that plaintiff should be given
5  autonomy.  However, he does not appear to complain of a lack of
6  staff.  Pltf's Exh. 24.  The email mentions the hiring of a person
7  named Anthony Lincoln and his subsequent departure, but does not
8  ask for more staff.  Id.

9    Next, plaintiff cites to a November 29, 2005 memorandum he
10 wrote to Sundstrom in which he summarized the programs and
11 resources offered currently or in the recent past by the PDC's
12 MWESB Outreach Team.  Pltf's Exh. 29.  On page twelve, (marked Pltf
13 00115), plaintiff asks for two full-time equivalent (FTE)
14 positions.  Id.  On March 1, 2006, plaintiff wrote to Sundstrom
15 and requested additional staff for the MWESB Section.  Pltf's Exh.
16 30.  On March 3, 2006, he sent Sundstrom an email again complaining
17 about losing an FTE the previous March and not having the person
18 replaced.  Pltf's Exh. 31.

19    Plaintiff states that Caucasian staff received additional
20 staffing or a reduction in responsibilities when they requested it.
21 Pltf's Declr. at ¶ 36.  He cites to a particular example of Diane
22 Lawrence who allegedly complained to Andrews about being overworked
23 and Andrews arranging for the removal of some of Lawrence's
24 responsibilities and shifting them to another employee.  Id.

25    Sometime in January 2006, several of the employees who had
26 previously spoken to Warner about diversity issues, met with
27 Sundstrom regarding a few of the issues raised in the earlier
28 November 2005 meeting with Warner.  Pltf's Declr. at ¶ 38.

18 - FINDINGS & RECOMMENDATION

Plaintiff attended the meeting. <u>Id.</u> In his deposition, plaintiff does not recall what was specifically said at the meeting other than one comment purportedly made by Sundstrom that African-American employees were not the only employees of color at the PDC and "if there were issues as defined as the ones [the group] had listed, then why aren't they stepping forward." Pltf's Depo. at p. 51-52; <u>see also</u> Pltf's Declr. at ¶ 38.

Sundstrom held weekly meetings with plaintiff to determine what issues he was working on. She had similar meetings with other subordinates, who were Caucasian. Sundstrom Declr. at ¶ 4. Plaintiff alleges that on a number of occasions, Sundstrom falsely claimed that plaintiff did not follow through on accomplishing certain things she had instructed him to do during these meetings. Pltf's Declr. at ¶ 39.

Plaintiff contends that before he met Sundstrom in her office on March 7, 2006, for one of these meetings, he "asked Ms. Sundstrom if I could bring a tape-recorder so I could effectively note down exactly what she wanted." Pltf's Depo. at p. 60. The record contains a copy of an email sent by plaintiff on March 7, 2006, at 1:03 p.m., to Sundstrom, which states:

> I wanted to follow-up regarding our last two meetings (2/24 & 3/3) and thank you for agreeing to my recording of our meeting in order that there is clear and consistent communication relating to my assignments from you. As I mentioned in our Feb. 24th meeting, I suggested recording our meetings as a result of my previous supervisor's attributing accusations that were confoundedly not true, and I would like to avoid that experience from happening again. If you like, I will provide you a transcript of our Mar 3rd meeting once I have completed it in order that we both may have the same consistent information. In the future, if you would prefer that I use a PDC recorder that would be fine by me. Again, thank you for your understanding and if there is anything I need to prepare for our meeting this

19 - FINDINGS & RECOMMENDATION

1   afternoon please advise.

2   Pltf's Exh. 32.

3   According to plaintiff, at the start of the March 7 meeting

4   with Sundstrom, he "put the tape-recorder down, and . . . asked her

5   do you mind if I tape the meetings." Pltf's Depo. at p. 62. He

6   states that he never insisted upon taping. Pltf's Declr. at ¶ 30.

7   According to plaintiff, Sundstrom responded that she did not "give

8   a damn whether he taped or not." Pltf's Depo. at p. 62. She then

9   got up shortly afterward, and left her office with plaintiff still

10  in it. Id. at pp. 58, 63. During this exchange, plaintiff

11  contends that Sundstrom raised her voice in a "tirade" concerning

12  performance issues she had with the inadequacies of plaintiff's

13  work on the plan for the South Waterfront project. Id. at pp. 65,

14  67-68.

15  Sundstrom states that after she and plaintiff sat down, he put

16  a tape-recorder on the table. Sundstrom Depo. at p. 211. She

17  reacted to the fact that the tape-recorder was on the table and

18  asked plaintiff what it was for. Id. at p. 212. She remembers

19  that plaintiff said, "[y]ou said I could tape-record meetings."

20  Id. Sundstrom stated that she had never said that; she then asked

21  him if he intended to tape-record the meeting. Id. She told him

22  that she considered the meeting over and asked him to leave her

23  office. Id. He did not, so she left. She states that in terms of

24  voice volume, she did not raise her voice. Id.

25  Plaintiff states he observed Sundstrom, after leaving her

26  office, go to general counsel Baines's office. Pltf's Depo. at p.

27  59. Not finding him, he observed her go to Warner's office. Id.

28  At that point, plaintiff returned to his cubicle. He states that

20 - FINDINGS & RECOMMENDATION

he "couldn't understand what happened" and the "next thing I know was that I was being terminated." Id. The March 7, 2005 exchange was the last meeting plaintiff had with Sundstrom before his termination.

Sundstrom decided to terminate plaintiff. In her deposition, she explains that the PDC exercised the termination provision of the Last Change Agreement because it determined that plaintiff had violated the terms of that agreement. Sundstrom Depo. at p. 219. Sundstrom further explained that she

> viewed that the act of him putting a tape-recorder on the table and wanting to record our conversation indicated that we had a broken working relationship and he was not able to communicate with me in a productive and professional way.

Id.

Defendants note that in his deposition, Warner implied that he and Sundstrom had spoken many times about plaintiff's MWESB Program and that in many of these conversations, they discussed plaintiff, and "his role, his involvement with the union, and his involvement or lack thereof about putting the agreements together that needed to be finalized to live up to PDC commitments to the South Waterfront Agreement." Warner Depo. at p. 102. He explained that certain agreements with the South Waterfront Partners had not been finalized, particularly those requiring using women and minority workforce members and the need to work with the general contractor and the labor unions to come up with an agreement as to how to get to a certain level of minority and women workforce participation. Id. at p. 104. Warner refused to lay the blame for the stalling of an agreement solely at plaintiff's feet. Id. at pp. 104-05. But, defendants rely on this testimony as another basis for plaintiff's

21 - FINDINGS & RECOMMENDATION

termination.

The termination letter signed by Sundstrom and dated March 7, 2005, states, in pertinent part:

> Pursuant to the terms of the Last Chance Agreement between you and the Portland Development Commission (PDC) dated October 3, 2005, your employment with PDC has been terminated effective immediately. The Last Chance Agreement addresses behavior expectations pertaining to your treatment of others, including your supervisor, and dependability in terms of timely completion of work assignments. You have not completed several recent assignments and have refused to discuss them with me, your supervisor, in a productive and respectful manner.

Pltf's Exh. 33.

STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex, 477 U.S. at

322-23.

The substantive law governing a claim determines whether a fact is material. T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Id.; In re Agricultural Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990); California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

DISCUSSION

Plaintiff brings race discrimination and retaliation claims under Title VII and Oregon Revised Statute § (O.R.S.) 659A.030. He also brings a race discrimination claim under 42 U.S.C. § 1981 and a First Amendment retaliation claim under 42 U.S.C. § 1983.

I.   Title VII and O.R.S. 659A.030 Discrimination Claims

Standards used to analyze federal Title VII claims apply to Oregon claims under O.R.S. Chapter 659A. E.g., Conley v. City of Lincoln City, No. CV-02-216-AS, 2004 WL 948427, at *13 (D. Or. Apr. 20, 2004) (citing cases for the proposition that Oregon courts consistently hold that case law developed by federal courts in the interpretation of Title VII is used to interpret Chapter 659);

23 - FINDINGS & RECOMMENDATION

1  Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1093

2  (9th Cir. 2001) (burden shifting formula of McDonnell Douglas Corp.

3  v. Green, 411 U.S. 792 (1973), applies to Oregon statutory

4  discrimination claims litigated in federal court); Granville v.

5  City of Portland, Nos. CV-02-1016-HA, CV-04-1295-HA, 2005 WL

6  1113841, at *3 (D. Or. May 10, 2005) (citing Henderson v. Jantzen,

7  Inc., 79 Or. App. 654, 719 P.2d 1322 (1986) for proposition that

8  McDonnell Douglas prima facie case requirements apply to Oregon

9  statutory discrimination claims).

10      The McDonnell Douglas burden-shifting framework requires the

11  plaintiff to first establish a prima facie case of unlawful

12  discrimination, followed by the defendant articulating a

13  legitimate, nondiscriminatory reason for its action. McGinest v.

14  GTE Serv. Corp., 360 F.3d 1103, 1122 n.16 (9th Cir. 2004).  If the

15  defendant does so, the plaintiff must show that the articulated

16  reason is a pretext for discrimination.  Id.; Aragon v. Republic

17  Silver State Disposal, Inc., 292 F.3d 654, 658-59 (9th Cir. 2002).

18      A.  Prima Facie Case

19      To establish a prima facie case of race discrimination,

20  plaintiff must show that (1) he belongs to a racial minority; (2)

21  he was qualified to do the job; (3) he was subjected to an adverse

22  job action; and (4) "either that similarly situated individuals

23  outside [his] protected class were treated differently, or other

24  circumstances surrounding the adverse employment action give rise

25  to an inference of discrimination."  Bodett v. CoxCom, Inc., 366

26  F.3d 736, 744 (9th Cir. 2004) (internal quotation omitted). "[T]he

27  requisite degree of proof necessary to establish a prima facie case

28  . . . on summary judgment is minimal and does not even need to rise

24 - FINDINGS & RECOMMENDATION

1  to the level of a preponderance of the evidence." Wallis v. J.R.
2  Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

3      There is no dispute that plaintiff is African-American.  There
4  is at least a question of fact as to whether he was adequately
5  performing his job.  There is no dispute that he suffered the
6  adverse employment action of termination.

7      As to the fourth prima facie element, plaintiff has at least
8  created an issue of fact as to whether, after his termination, his
9  job duties were performed by Classen, a Caucasian.  Pltf's Declr.
10 at ¶ 44 (noting what while PDC discovery documents showed that
11 Sundstrom announced she intended to create a "Diversity Manager"
12 position to replace plaintiff, it does not appear the position was
13 filled; documents show that Classen was promoted into plaintiff's
14 former position which was titled "Contracts Compliance Manager"
15 when plaintiff had it, but was reclassified as "Contracts
16 Compliance Coordinator"); Pltf's Exh. 39 (a January 2007
17 reclassification request form to reclassify the "Contracts
18 Compliance Coordinator" position held by Classen, at a higher
19 salary, and specifically stating that previously, the duties had
20 been performed by the Contracts Compliance Manager).

21     In Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062
22 (9th Cir. 2002), the court explained that the plaintiff could
23 satisfy the fourth element of her prima facie case of sex
24 discrimination by showing that similarly situated men were treated
25 more favorably "or her position was filled by a man" after her
26 termination.  Thus, here, plaintiff's evidence suggesting that
27 Classen, a Caucasian, replaced plaintiff following his discharge,
28 is sufficient to satisfy the fourth element of the prima facie

25 - FINDINGS & RECOMMENDATION

1  case.

2      B.  Legitimate Nondiscriminatory Reason

3      The March 7, 2005 termination letter, and the individual

4  defendants' deposition testimony, show that Sundstrom concluded

5  that plaintiff had violated the terms of the Last Chance Agreement

6  and that he had failed to meet other deadlines and goals for his

7  program.  These are legitimate, nondiscriminatory reasons for the

8  termination decision.

9      C.  Pretext

10     Plaintiff can establish pretext in two ways:  "(1) indirectly,

11  by showing that the employer's proffered explanation is 'unworthy

12  of credence' because it is internally inconsistent or otherwise not

13  believable, or (2) directly, by showing that unlawful

14  discrimination more likely motivated the employer."  Chuang v.

15  University of Ca. Davis, Bd. of Trustees, 225 F.3d 1115, 1127 (9th

16  Cir. 2000).  Plaintiff does not need to prove both at summary

17  judgment.  To survive summary judgment, plaintiff is not required

18  to provide direct evidence of discriminatory intent as long as a

19  reasonable factfinder could conclude, based on plaintiff's prima

20  facie case and the factfinder's disbelief of defendant's reasons

21  for discharge, that discrimination was the real reason for

22  defendant's actions.  Nidds v. Schindler Elevator Corp., 113 F.3d

23  912, 918 n.2 (9th Cir. 1996).

24     Additionally, plaintiff does not have to introduce additional,

25  independent evidence of discrimination at the pretext stage.

26  Chuang, 225 F.3d at 1127.  Rather, "a disparate treatment plaintiff

27  can survive summary judgment without producing any evidence of

28  discrimination beyond that constituting his prima facie case, if

26 - FINDINGS & RECOMMENDATION

that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." Id.

A plaintiff is required to produce "very little" direct evidence of an employer's discriminatory intent to move past summary judgment. Id. at 1128. If the plaintiff relies on circumstantial evidence, it must be "specific" and "substantial" to create a triable issue of fact as to whether the employer intended to discriminate. Godwin, 150 F.3d at 1222.[2]

Circumstantial evidence "can take two forms." Coghlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005). The plaintiff can make an affirmative case that the employer is biased by relying on statistical evidence. Id. Or, "the plaintiff can make his case negatively, by showing the employer's proffered explanation for the adverse action is 'unworthy of credence.'" Id. As the Supreme Court explained in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000), "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Moreover, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may

_____

[2] But see Cornwell v. Electra Cent. Credit Un., 439 F.3d 1018, 1030-31 (9th Cir. 2006) (discussing whether post-Godwin cases may have overturned the Godwin requirement that a plaintiff's circumstantial evidence of pretext must be "specific and "substantial," but not finally deciding the issue because the evidence presented by the plaintiff was sufficient to create a genuine issue of fact regarding the defendant's motive for its actions under the Godwin specific and substantial standard in any event).

27 - FINDINGS & RECOMMENDATION

permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148.

Plaintiff presents no direct evidence of race discrimination. Instead, plaintiff relies on the following circumstantial evidence to create an issue of pretext:  (1) plaintiff did not receive adequate staffing while Lawrence, a Caucasian employee, did; (2) Sundstrom, a Caucasian, replaced Winston, an African-American; (3) Sundstrom allegedly treated the only other African-American employee she directly supervised poorly; (4) a comment Sundstrom made at the January 2006 meeting with African-American employees; (5) the resignation by African-American employee Rita McCain-Walker in April 2006; (6) the failure to timely give a raise to African-American employee Komi Kalevor; (7) the fact that twenty-two African-American employees left the PDC between mid-2004 and mid-2006; and (8) a history of race discrimination at the PDC as evidenced by certain events occurring in 1991.

For the reasons explained below, I conclude that the evidence regarding Sundstrom's treatment of her only other African-American employee, her comment at the January 2006 meeting, and McCain-Walker's complaint in November 2005 that poor treatment of her by her Caucasian supervisor was creating a problem with her ability to obtain a raise or a promotion, combine to produce specific and substantial circumstantial evidence of pretext.  Because I need not do so, I decline to address the relevance or admissibility of the other evidence plaintiff proffers in support of his pretext argument.

### 1.  Sundstrom's Treatment of Cain

In early 2006, Sundstrom supervised only two African-American

28 - FINDINGS & RECOMMENDATION

employees - plaintiff and Christina Cain.  Pltf's Declr. at ¶ 43.
Cain has been at the PDC for thirty years, and for seventeen years
preceding June 2006, a few months after plaintiff's termination,
she had been the Senior Executive Assistant to the Commission.
Pltf's Exh. 50 (Cain Declr.) at ¶¶ 1-2.

Cain alleges that after Sundstrom started in November 2005,
and especially after she and other African-American employees held
meetings with Warner and Sundstrom regarding the retention of
African-American employees at the PDC, Sundstrom began treating
Cain poorly.  Id. at ¶ 3, 14, 15, 16.  Specifically, Cain states
that Sundstrom unjustly criticized her work performance, was not
positive with her, was not supportive of her, micro-managed her
work, refused her requested time off, and made demeaning comments
to her such as "[y]ou should be happy to still have a job here,"
"[y]ou should be happy to still be making the same amount of money
here," and "[y]ou should be happy that you are still on the 7th
(executive office) floor."  Id. at ¶ 14.

Cain recites that during a March 31, 2006 meeting with
Sundstrom, Sundstrom told Cain that she had poor interpersonal
skills, had no communication skills, was not well liked by anyone,
and that Sundstrom thought Cain was "playing" her and Sundstrom was
"fed up" with her.  Id. at ¶ 15.  Cain also states that Sundstrom
repeatedly cancelled scheduled meetings between them which were
important to Cain's performance of her job and that Sundstrom
refused to speak to her from time to time.  Id. at ¶ 16.

Cain further states that Sundstrom abruptly removed Cain's
administrative support staffperson and placed that person under
Sundstrom's supervision.  Id.  Sundstrom then had that staffperson

29 - FINDINGS & RECOMMENDATION

1   replace Cain at the Commission meetings, which Cain had been
2   attending for seventeen years.  Id.

3       Cain asserts that never before had she been treated by any
4   supervisor at PDC the way Sundstrom treated her.  Id.  She further
5   states that she observed Sundstrom interact with Sundstrom's other,
6   Caucasian subordinates and that Sundstrom did not use a demeaning
7   tone of voice with them, was not negative with them, and did not
8   treat them with a lack of respect, as she did when she interacted
9   with Cain.  Id. at ¶ 17.

10      Cain complained to Human Resources and filed internal
11  grievances.  Id. at ¶¶ 19; Pltf's Exhs. 61, 62.  Id.  On May 15,
12  2006, she filed an Oregon Bureau of Labor and Industries (BOLI)
13  complaint against the PDC alleging race discrimination and
14  retaliation.  Id. at ¶ 21; Pltf's Exh. 64.

15      As the Ninth Circuit discussed in a 1995 case, "an employer's
16  conduct tending to demonstrate hostility toward a certain group is
17  both relevant and admissible where the employer's general hostility
18  towards that group is the true reason behind firing an employee who
19  is a member of that group."  Heyne v. Caruso, 69 F.3d 1475, 1479
20  (9th Cir. 1995) (citing Spulak v. K Mart Corp., 894 F.2d 1150, 1156
21  (10th Cir. 1990) ("As a general rule, the testimony of other
22  employees about their treatment by the defendant [employer] is
23  relevant to the issue of the employer's discriminatory intent."),
24  Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (8th Cir. 1988)
25  ("[e]vidence of prior acts of discrimination is relevant to an
26  employer's motive in discharging a plaintiff, even where this
27  evidence is not extensive enough to establish discriminatory animus
28  by itself.")).

30 - FINDINGS & RECOMMENDATION

1    The Heyne court concluded that the district court abused its
2    discretion by refusing to allow the plaintiff to introduce
3    testimony of other employees who claimed to have been harassed by
4    the same supervisor.  Id. at 1482.  The testimony was allowable
5    because it could have affected the jury's determination of whether
6    the plaintiff's dismissal was motivated by a non-discriminatory
7    reason or for a forbidden reason.  Id.

8        Under Heyne, Cain's testimony is relevant and admissible.
9    Cain recites specific statements and conduct.  Her testimony
10   addresses conduct occurring during the same time period as
11   plaintiff's termination and by the same supervisor.  I conclude
12   that Cain's testimony is specific and substantial circumstantial
13   evidence by which the factfinder could infer that defendants'
14   articulated motive for its actions, is a pretext for race
15   discrimination.

16                 2.  Sundstrom's January 2006 Comment
17       At the meeting in January 2006 that African-American employees
18   held with Sundstrom to discuss diversity-related issues previously
19   raised with Warner in November 2005, and specifically, the
20   treatment of African-American employees, Sundstrom allegedly said
21   that African-Americans were not the only employees of color at the
22   PDC and "if there were issues as defined as the ones we had raised,
23   whey aren't they stepping forward?"  Pltf's Depo. at p. 51-52;
24   Pltf's Declr. at ¶ 38.

25       Plaintiff argues that this statement by Sundstrom is evidence
26   of a bias against African-Americans because it minimized the
27   group's complaints.  I agree with plaintiff that Sundstrom's
28   statement can be interpreted as being dismissive of the complaints

31 - FINDINGS & RECOMMENDATION

made by African-American employees and thus, could be interpreted
to show animosity toward those employees.  While it is possible
that Sundstrom was trying to gauge broader questions of diversity
at the PDC by inquiring if other groups were also feeling
discriminated against, the factfinder should evaluate what
Sundstrom meant.  Because is a specific statement, occurring
approximately two months before plaintiff was terminated, was made
by the person who terminated plaintiff, and can be interpreted to
exhibit racial bias, it is specific and substantial circumstantial
evidence of pretext.

### 3.  McCain-Walker's Resignation

Rita McCain-Walker was the Homeownership Coordinator for the
PDC.  Pltf's Exh. 38 at p. 2.  In his Amended Memorandum in
Opposition to Defendants' Motion for Summary Judgment, plaintiff
states that McCain-Walker, who is African-American, complained
about poor treatment from her Caucasian supervisor during the
November 2005 meeting with Warner.  Pltf's Am. Mem. at p. 27
(noting that "[a]lso brought to Warner's attention were the
problems McCain-Walker, another employee, was having with her
Caucasian supervisor, which were affecting her ability to get
raises and a promotion she was seeking").

Plaintiff also asserts that "McCain-Walker had to resign her
position as PDC Homeownership Coordinator in April 2006, as a
direct result of ongoing poor/unfair treatment by her supervisor."
Id.

The evidence in the record cited in support of these
assertions consists of:  (1)  a statement by Cain in her
declaration; (2) Warner's deposition testimony; (3) McCain-Walker's

32 - FINDINGS & RECOMMENDATION

1  resignation letter; and (4) plaintiff's declaration.

2      Plaintiff recites in his declaration that McCain-Walker's
3  supervisor was Caucasian.   Pltf's Declr. at ¶ 48.   In her
4  declaration, Cain states that at the meeting with Warner in
5  November 2005, she recalled McCain-Walker raising an issue about
6  McCain-Walker's manager treating her unfairly and how that was
7  hindering her ability to get a raise and be promoted.  Pltf's Exh.
8  50 (Cain Declr.) at ¶ 11.

9      Warner testified that he believed that "maybe" McCain-Walker
10  had, at the November 2005 meeting, "talked about her experience
11  that she didn't feel she was being utilized to her fullest in the
12  organization in terms of her full capabilities[.]"  Pltf's Exh. 75
13  (Warner Depo.) at p. 74.  Warner's testimony establishes only that
14  McCain-Walker spoke about her alleged underutilization.  It does
15  not support plaintiff's assertion that McCain-Walker mentioned
16  interference with a raise or a promotion.

17     Plaintiff's Exhibit 38 is McCain-Walker's April 28, 2006
18  resignation letter.  Pltf's Exh. 38.  Notably missing from the
19  letter is any reference to problems McCain-Walker had with her
20  Caucasian supervisor, or problems getting a raise or a promotion.
21  Id.

22     McCain-Walker mentions what she viewed as a "lack of
23  commitment, value and support for my position," and considered this
24  "an obstacle to progress and the mission of PDC."  Id.  She noted
25  that she "felt less valued as a professional and particularly an
26  African-American employee."  Id.  She also stated that "PDC's
27  commitment to African American homeownership is seriously lacking
28  as compared to other minority groups."  Id.  She continued by

33 - FINDINGS & RECOMMENDATION

stating that "[f]rom what I have learned in the African American community, there is deep resentment and lack of trust and based on my personal experience, I can't totally disagree with these opinions."  Id.

Finally, McCain-Walker stated:

> Equally important in my decision to accept this [non-PDC] position has been the removal of African American employees from this organization.  I sincerely hope that PDC's management addresses the precarious environment for African American employees whose contributions, diversity, suggestions and work are questioned, under-valued and viewed as complaints rather than efforts to move the organization forward.

Id.

In his deposition, Warner states that he talked with McCain-Walker a number of times and that she expressed to him the concerns and reasons she gave for resigning.  Pltf's Exh. 75 (Warner Depo.) at p. 126.  Other than stating that he knew that McCain-Walker believed that the PDC's commitment to African-American homeownership was severely lacking as compared to other minority groups, he does not specify what concerns she actually raised with him or when they discussed these concerns.  Id. at pp. 126, 128.

The resignation letter fails to show that McCain-Walker actually resigned because of problems created by her Caucasian supervisor making it difficult for her to obtain a raise or promotion.  The letter does not mention the supervisor, either by position or name, and does not mention the lack of a raise or promotion.  McCain-Walker's general reference to being undervalued and underutilized is not evidence that the Caucasian supervisor treated her poorly because she was African-American.

Additionally, the other reasons for her resignation as stated

34 - FINDINGS & RECOMMENDATION

1  in her April 18, 2006 letter, do not, without offering specific
2  facts in support of her opinions, create an issue of pretext.  The
3  letter contains nothing more than McCain-Walker's opinions with no
4  evidentiary basis in support.  While she states that there were
5  "strenuous" days where she felt "less valued" as a professional and
6  particularly as an African-American employee, she offers no facts
7  upon which she bases this opinion.  She offers her opinion that
8  PDC's commitment to African-American homeownership was lacking as
9  compared with other minority groups, but again, she offers no facts
10  in support.  She refers to the "precarious environment for African-
11  American employees" and notes the "removal" of African-American
12  employees, but she cites no facts supporting her belief that the
13  environment was "precarious" or supporting her insinuation that the
14  "removal" was motivated by ill-will toward African-Americans.
15  Without such facts, the opinions offered in the resignation letter
16  cannot be considered specific and substantial evidence of pretext.

17       However, even without considering the resignation letter or
18  Warner's deposition testimony, Cain's statement that McCain-Walker
19  raised an issue of poor treatment by a Caucasian supervisor is
20  additional evidence of pretext which is appropriate to consider
21  under Heyne.  Importantly, while the supervisor at issue is not
22  Sundstrom, the alleged poor treatment by a Caucasian supervisor,
23  coupled with the fact that McCain-Walker resigned approximately
24  five months later, raises an inference of pretext.

25       Considered together, the evidence regarding Sundstrom's
26  treatment of Cain, Sundstrom's statement at the January 2006
27  meeting with African-American employees, and McCain-Walker's
28  November 2005 complaint to Warner, is appropriately considered

35 - FINDINGS & RECOMMENDATION

specific and substantial circumstantial evidence of pretext. Accordingly, I recommend that defendants' summary judgment motion as to the Title VII and O.R.S. 659A.030 discrimination claims, be denied.

II.  42 U.S.C. § 1981 Race Discrimination Claim

Plaintiff brings a section 1981 claim against the PDC, alleging that the PDC impaired his employment contract rights on the basis of race.  Compl. at ¶ 27.  Under section 1981(a), all persons have the same right to make and enforce contracts and the full and equal benefits of all laws "as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  As explained in <u>Lowe v. City of Monrovia</u>, 775 F.2d 998, 1010 (9th Cir. 1985), <u>amended</u>, 784 F.2d 1407 (9th Cir. 1986), claims of disparate treatment under section 1981 and Title VII are parallel because both require proof of intentional discrimination.  The same standards are used to prove both a Title VII disparate treatment claim and a section 1981 claim.  <u>Id.</u>  "[F]acts sufficient to give rise to one are sufficient to give rise to the other."  <u>Id.</u>

Based on <u>Lowe</u>, defendants make no new arguments in support of their motion against the section 1981 claim.  Plaintiff agrees that the same legal standard applies to both claims.  Pltf's Am. Mem. at p. 22 n.27.

Thus, my recommendation on this claim is consistent with my recommendation on the Title VII claim:  defendants' motion should be denied.

III.  Title VII and O.R.S. 659A.030 Retaliation Claims

As with the straightforward disparate treatment discrimination claims, the federal and state retaliation claims share the same

36 - FINDINGS & RECOMMENDATION

analysis, <u>Payne v. Apollo College - Portland, Inc.</u>, 327 F. Supp. 2d 1237, 1245 (D. Or. 2004), and thus, are discussed together.

The order and allocation of proof for disparate treatment cases under <u>McDonnell Douglas</u> also govern actions for retaliatory discharge under Title VII. <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987). If the plaintiff establishes a prima facie case, the burden shifts as in a disparate treatment case. <u>Stegall v. Citadel Broadcasting Co.</u>, 350 F.3d 1061, 1066 (9th Cir. 2003).

To establish a prima facie case of retaliation, plaintiff must show (1) that he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) the employer's action is causally related to the protected activity. <u>Id.</u> at 1065-66.

Defendants do not appear to dispute that plaintiff engaged in protected activity and that he was subjected to an adverse employment action. As noted above, his termination is clearly an adverse employment action. His participation in the meeting in November 2005 with Warner and in January 2006 with Sundstrom regarding diversity issues at the PDC and in particular, treatment of African-Americans, is protected activity. <u>Ray v. Henderson</u>, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000) (making an informal complaint to a supervisor is a protected activity).

In <u>Villiarimo</u>, the Ninth Circuit confirmed that timing alone can satisfy the third prima facie factor of causation. 281 F.3d at 1065. But, the court was careful to explain that this is not true in every case. <u>Id.</u> In a 2001 case, the Supreme Court noted that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as

37 - FINDINGS & RECOMMENDATION

1  sufficient evidence of causality to establish a prima facie case

2  uniformly hold that the temporal proximity must be 'very close.'"

3  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

4        In a case after Villiarimo, the Ninth Circuit rejected a

5  bright line temporal proximity test. Coszalter v. City of Salem,

6  320 F.3d 968, 977-78 (9th Cir. 2003) (noting that retaliation often

7  follows quickly upon the act that offended the retaliator but that

8  is not always so because for a variety of reasons, some retaliators

9  prefer to take their time and may wait until the victim is

10  especially vulnerable or until an especially hurtful action is

11  possible or until they think the lapse of time disguises their true

12  motivation).

13       Here, plaintiff establishes the prima facie causation element

14  by showing that he engaged in protected activity in January 2006

15  and that Sundstrom terminated him two months later, in March 2006.

16  This is a sufficiently short period of time to raise an issue of

17  causation.

18       Following the rest of the McDonnell Douglas burden shifting

19  analysis, as recited above, defendants offer legitimate,

20  nondiscriminatory reasons for the termination. Plaintiff, however,

21  based on the discussion above in connection with the discrimination

22  claims, creates an issue of pretext sufficient to defeat

23  defendants' summary judgment motion. I recommend that the motion

24  be denied as to the retaliation claims.

25  IV.  42 U.S.C. § 1983 First Amendment Retaliation Claim

26       Plaintiff brings this claim against all three defendants. In

27  the Second Amended Complaint, he generally alleges that at least in

28  part, defendants' conduct has been in retaliation for his protected

38 - FINDINGS & RECOMMENDATION

speech about a matter of public concern, that is, racial discrimination and the lack of diversity at the PDC and in the community. Sec. Am. Compl. at ¶ 21.

To sustain a section 1983 First Amendment retaliation claim, plaintiff must show that the speech at issue was constitutionally protected, that he suffered an adverse employment action, and that the speech was a substantial or motivating factor in the adverse employment action. Pool v. Van Rheen, 297 F.3d 899, 906 (9th Cir. 2002); Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000).

Defendants make no argument regarding the first two factors. As noted above, there is no question that plaintiff suffered an adverse employment action. I interpret defendants' failure to raise the first factor as a concession that plaintiff's statements at the meetings with Warner in November 2005 and with Sundstrom in January 2006, are constitutionally protected.

Defendants argue that they are entitled to summary judgment because plaintiff cannot show that his speech was a substantial or motivating factor in his termination. I disagree.

In Coszalter, the Ninth Circuit reiterated that there are "three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions." Coszalter, 320 F.3d at 977. First, a plaintiff can rely on proximity of time between the protected action and the alleged retaliatory employment decision to show that the plaintiff was terminated in retaliation for his speech. Id.

Second, "a plaintiff can introduce evidence that his employer expressed opposition to his speech, either to him or to others."

39 - FINDINGS & RECOMMENDATION

1  <u>Id.</u> (internal quotation omitted).  Third, a plaintiff can introduce
2  evidence that his "employer's proffered explanations for the
3  adverse employment action were false and pre-textual."  <u>Id.</u>

4      As to proximity in time, the court noted that "[d]epending on
5  the circumstances, three to eight months is easily within a time
6  range that can support an inference of retaliation."  <u>Id.</u>  Here,
7  plaintiff's termination occurred approximately four months after he
8  and others met with Warner in November 2005 and approximately two
9  months after he and others met with Sundstrom in January 2006.
10 This proximity in time between his protected speech and his
11 termination creates an issue of fact as to whether plaintiff's
12 protected speech was a motivating factor in his termination.

13     Additionally, plaintiff's evidence of pretext, discussed above
14 in connection with the Title VII claims, is sufficient here to
15 create an issue of fact regarding defendants' motivation.  Thus, I
16 recommend that defendants' motion on the section 1983 First
17 Amendment claim, be denied.

18 V.  Punitive Damages

19     As an alternative to their motions directed to the merits of
20 each claim, defendants separately move against plaintiffs' claims
21 for punitive damages.

22     Defendants make arguments in opposition to plaintiff's alleged
23 request for punitive damages on the section 1981 and 1983 claims,
24 and the Title VII and O.R.S. 659A.030 claims.  However, under my
25 reading of the Second Amended Complaint, I do not see that
26 plaintiff seeks punitive damages on the race discrimination or
27 retaliation claims under Title VII or O.R.S. 659A.030.

28     In his section 1983 claim, his First Claim for Relief pleaded

40 - FINDINGS & RECOMMENDATION

1  in the Second Amended Complaint, plaintiff expressly demands
2  punitive damages against Sundstrom and Warner. Sec. Am. Compl. at
3  ¶ 24.  In his section 1981 claim, his Second Claim for Relief, he
4  expressly demands punitive damages against the PDC.  Id. at ¶ 28.

5      In his O.R.S. 659A.030 claim for race discrimination and
6  retaliation, plaintiff makes no mention of punitive damages, other
7  than to apparently incorporate by reference his prior allegations.
8  Id. at ¶ 30 ("As applicable, Henry alleges the above.").  He
9  asserts that "[p]ursuant to ORS 659A.885(1) and ORS 20.107, Henry
10 should be awarded his lost back pay, equitable relief, his
11 reasonable attorney fees, and litigation costs and expenses,
12 including expert witness fees." Id. at ¶ 32.  For actions brought
13 under O.R.S. 659A.030, O.R.S. 659A.885 makes no provision for
14 punitive damages.  O.R.S. 20.107 provides for attorney's and expert
15 witness fees for prevailing plaintiffs in discrimination cases, but
16 also makes no provision for punitive damages.

17     Similar to his O.R.S. 659A.030 claim, in his Title VII race
18 discrimination and retaliation claim, plaintiff makes no express
19 mention of punitive damages, other than to apparently incorporate
20 by reference his prior allegations.  Id. at ¶ 37 ("As applicable,
21 Henry realleges the above.").  Here, he expressly states that he
22 should be awarded lost back pay, front pay, and work-related
23 benefits against the PDC, as well as compensatory damages, and
24 reasonable attorney's fees and litigation costs, including expert
25 witness fees.  Id. at ¶¶ 40, 41, 42.

26     While Title VII allows for punitive damages, if there were any
27 ambiguity in plaintiff's Third and Fifth Claims for Relief,
28 paragraph four of the Prayer of the Second Amended Complaint

41 - FINDINGS & RECOMMENDATION

reiterates plaintiff's assertion of punitive damages and fails to mention either the O.R.S. 659A.030 claims or the Title VII claims; it thus makes clear that plaintiff is not seeking punitive damages on those claims.  Thus, I recommend that defendants' motion as to any punitive damages associated with plaintiff's third and fifth claims, be granted.

Additionally, while the Second Claim for Relief asserts a claim for punitive damages against the PDC in connection with the section 1981 claim, the Prayer mentions punitive damages only as to plaintiff's First Claim for Relief, which is the section 1983 claim, and mentions only Sundstrom and Warner, and not the PDC. Moreover, as I explained in my October 18, 2006 Findings & Recommendation on defendants' motion to dismiss, the law does not allow an assessment of punitive damages against a municipality in a section 1981 claim.  See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981) (punitive damages not available against a municipality in a section 1983 action); Bell v. City of Milwaukee, 746 F.2d 1205, 1270 (7th Cir. 1984) (applying holding of City of Newport to section 1981 claims), overruled on other grounds, Russ v. Watts, 414 F.3d 783, 791 (7th Cir. 2005).  Because plaintiff brings the section 1981 claim against the PDC only, and punitive damages are not allowed against that entity, I recommend that defendants' motion as to any punitive damages claim sought as part of the section 1981 claim, be granted.

Finally, as to the section 1983 claim, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the

42 - FINDINGS & RECOMMENDATION

1  federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30,

2  56 (1983).  It is unnecessary to show actual malice to qualify for

3  a punitive damages award.  <u>Id.</u> 45-48.

4      Defendants argue that neither Sundstrom's nor Warner's actions

5  meet the required showing of "malice" or "reckless indifference."

6  As to Sundstrom, defendants argue that because she acted within her

7  discretion as a supervisor and made decisions based on legitimate

8  business reasons, her actions do not meet the required threshold

9  for punitive damages.  As to Warner, defendants contend that since

10  plaintiff's allegations against Warner are based on his knowledge

11  or ratification of Sundstrom's alleged discrimination and

12  retaliation, if punitive damages are inappropriate as to her, they

13  are inappropriate as to him.

14      Defendants' arguments hinge on the factfinder accepting

15  defendants' interpretation of the facts.  If plaintiff's version of

16  the facts is found to be true, a jury could find that both

17  Sundstrom and Warner acted with reckless indifference to

18  plaintiff's civil rights.  I recommend that the motion for summary

19  judgment directed to the punitive damages portion of the section

20  1983 claim, be denied.

21  V.  Motion to Strike

22      Plaintiff moves to strike certain portions of the record and

23  argument offered by defendants.  I deny the motion for two reasons.

24  First, I agree with defendants that plaintiff failed to comply with

25  Local Rule 7.1(a)(1) requiring that the parties confer before

26  filing a motion.  Second, I deny the motion as moot because even

27  without striking the challenged evidence, I recommend that the

28  summary judgment motion on the merits of all of the claims, be

43 - FINDINGS & RECOMMENDATION

1    denied.

2        Plaintiff first filed the motion to strike on June 8, 2007,

3    the same date plaintiff filed his initial opposition to the summary

4    judgment motion.   I denied the motion for failure to include a

5    certificate of conferral under Local Rule 7.1, with leave to refile

6    with the appropriate conferral.   On July 2, 2007, plaintiff filed

7    an amended motion to strike.   It starts with a "CERTIFICATE OF

8    COMPLIANCE" which states:  "Counsel for the parties have conferred

9    in good faith on this motion, which is opposed."  Pltf's Am. Mtn to

10   Strike at p. 1.

11       In defendants' response to the motion to strike, defendants

12   report that contrary to what is stated in the certificate of

13   compliance in plaintiff's amended motion to strike, no conferral

14   took place.   The Local Rule requires that plaintiff certify that

15   "[t]he parties made a good faith effort through personal or

16   telephone conferences to resolve the dispute and have been unable

17   to do so" or that "[t]he opposing party willfully refused to

18   confer."  L.R. 7.1(a)(1).

19       According to defendants, and not disputed by plaintiff, after

20   the June 25, 2007 denial of plaintiff's initial motion to strike

21   for failure to comply with the certificate of conferral

22   requirement, plaintiff's counsel sent defense counsel a fax on that

23   same date, June 25, 2007, stating:

         Please confirm that defendants oppose Plaintiff's Motion
24       to Strike Portions of Record and Argument Offered by
         Defendants in Support of Defendants' Motion for Summary
25       Judgment so I can refile the motion and inform the court
         accordingly.  If you seriously believe there is something
26       for us to confer about in this regard, please give me a
         call.  I should be available most anytime tomorrow if you
27       call.

28

44 - FINDINGS & RECOMMENDATION

Thank you for your anticipated prompt attention to this matter.

Exh. 2 to Belnavis July 16, 2007 Declr.

On July 2, 2007, plaintiff's counsel sent defense counsel another fax which stated:

I wrote you on 6/25/07 as follows:

"Please confirm that defendants oppose Plaintiff's Motion to Strike Portions of Record and Argument Offered by Defendants in Support of Defendants' Motion for Summary Judgment so I can refile the motion and inform the court accordingly. If you seriously believe there is something for us to confer about in this regard, please give me a call. I should be available most anytime tomorrow if you call."

Having heard nothing from you, when I file the motion today I will tell the court that we have conferred and it is opposed.

Exh. 3 to Belnavis July 16, 2007 Declr.

Defendants argue, and I agree, that plaintiff's actions are insufficient to satisfy the Local Rule not only because plaintiff's counsel failed to engage in personal or telephone conferences, but because he never engaged in any substantive discussions to resolve the dispute presented by the motion.

I agree with defendants that, especially after having the motion denied once for failure to confer, or at least recite the conferral, it should be denied on this basis.

Alternatively, I deny the motion to strike as moot because even without striking the evidence, I recommend that the summary judgment motions directed to the merits of the claims, be denied.

CONCLUSION

I recommend that defendants' motion for summary judgment (#47) be denied in all respects except for that part of the motion

45 - FINDINGS & RECOMMENDATION

directed to any punitive damages which plaintiff seeks on her Title VII, O.R.S. 659A.030, or section 1981 claims.  I deny plaintiff's amended motion to strike (#73).

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due October 2, 2007.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due October 16, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this __18th__ day of __September__, 2007.


___/s/ Dennis James Hubel_____
Dennis James Hubel
United States Magistrate Judge

46 - FINDINGS & RECOMMENDATION